## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO.   3:19-00246-01
                                                           3:19-00246-06

GEORGE DEVONTE LANGFORD
  also known as "J.P." and "Mike"
and DENNIS DEIRE MOSLEY, JR.

### MEMORANDUM OPINION AND ORDER

   Pending before the Court is Defendant Dennis Deire Mosley, Jr.'s Motions for a Franks Hearing (ECF Nos. 392, 450), Motion to Dismiss Fourth Superseding Indictment for a Speedy Trial Violation (ECF No. 472), and his Motion for Release on Bail Due to 18 U.S.C. § 3164(b) Violation. ECF No. 474. Co-Defendant George Devonte Langford has joined in the motions for a Franks hearing and to dismiss. ECF No. 483. On Monday, October 25, 2021, the Court held a hearing on the motions. Upon consideration of the parties' arguments, the motions are **DENIED**.

   Defendants Mosley and Langford are named in a twelve-count fourth superseding indictment with Calvin Eugene Wells, Jr. and Frederick Clyde Waite, charging them with a variety of controlled substance offenses,[1] including all four Defendants being charged in Count One with conspiring to distribute methamphetamine, heroin, and fentanyl in violation of 21 U.S.C. § 846. The original indictment was returned by a grand jury sitting in Beckley on September 24, 2019,

---

[1]Count Twelve charges Defendant Langford with attempting to obstruct, influence, and impede an official proceeding in violation of 18 U.S.C. § 1512(c)(2).

naming these four defendants and Darla Renae Lattea, Lamark Glover, Jared Matthew Whittington, Michael Eugene Hicks, and Weston Dallas McDaniels as additional defendants. On November 5, 2019, a superseding indictment was returned by a grand jury sitting in Huntington. Thereafter, a second superseding indictment was returned on January 15, 2020, by a grand jury sitting in Beckley. On June 23, 2020, a grand jury sitting in Charleston returned a third superseding indictment. Finally, the fourth and current superseding indictment was returned by the Charleston grand jury on June 10, 2021. Of the original nine defendants, Lattea, Glover, Whittington, Hicks, and McDaniels entered guilty pleas prior to the hearing on these motions, and Waite entered a plea on November 1. Wells has not been arrested. The only defendants scheduled for trial on November 9 were Mosley and Langford. Following the Court's ruling from the bench, Mosley entered a guilty plea on November 2, and Langford entered a guilty plea on November 3, 2021.

## I.
## Motions for a Frank's Hearing

Defendant Mosley's first argument is that the Court should grant him a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because the affidavit submitted to the Court by Special Agent Antonio Ortega in support of the Government's Application for Interception of Wire and Electronic Communications contains false information. Mosley contends Special Agent Ortega's affidavit constitutes a reckless disregard for the truth and was material to the finding of probable cause, necessitating a *Franks* hearing. The United States argues Mosley has failed to make the necessary preliminary showing to justify such a hearing. Upon review, the Court agrees with the United States.

In *Franks*, the United States Supreme Court held that the Fourth Amendment may be violated when "a false statement knowingly and intentionally, or with reckless disregard for the

truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause[.]" 438 U.S. at 155-56. As a warrant is a fundamental indication of the existence of probable cause, a defendant bears a heavy burden to get a *Franks* hearing. *United States v. Jeffus*, 22 F.3d 554, 558 (4th Cir. 1994). Specifically, "a defendant must make a 'substantial preliminary showing' that the affiant made (1) a false statement (2) 'knowingly and intentionally, or with reckless disregard for the truth' that was (3) 'necessary to the finding of probable cause.'" *United States v. White*, 850 F.3d 667, 673 (4th Cir. 2017) (quoting *Franks¸* at 155–56).

As part of their investigation into the conspiracy, agents used multiple court-authorized wiretaps over a variety of telephone lines. As relevant here, the United States obtained wiretaps covering July 21 and July 24, 2019. The wiretaps covering July 21 and 24 were for phones issued to Mosley's codefendants, including Langford. While intercepting the telephone conversations, agents believed that Mosley and Langford were planning to get a large quantity of methamphetamine in Columbus, Ohio on July 24, 2019. Three days earlier, on July 21, agents intercepted a three-way call with Mosley, Langford, and Wells, in which the following conversation transpired:

| LANGFORD: | Yo. |
| MOSLEY: | Hello. Yo. |
| WELLS: | Yo, yo, yo, yo, What's up? |
| MOSLEY: | Shit, getting this math together. He showing me how he about to do this shit. It's going, it's going come. The whole play come up to 22, 22, 5. The whole play. That's what I paid for the, the whole nine, 22, yeah, that's, but |

|  | hold on, hold on, hold on let me speak to 'em. Huh? |
|---|---|
| WELLS | Yo. |
| MOSLEY: | [Inaudible] |
| WELLS: | Huh? |
| MOSLEY: | He, he said, he, he said the act was 500. |
| UNIDENTIFIED MALE: | Right, alright.[2] |
| MOSLEY: | I already gave him the other 500. |
| UNIDENTIFIED MALE: | Okay, it's good. |
| MOSLEY: | Alright, so, he got, that mean he got, he got 18. We gave him, we gave him 15 the first time. We gave him 18 last time, and now 22-5, 22-5 this time. |
| UNIDENTIFIED MALE: | Right. |
| MOSLEY: | And he said on the front he gone be wanting 28. |
| UNIDENTIFIED MALE: | Right, right, right. |
| MOSLEY: | And, so when he's fronting them, he giving us, we getting fronted what we cop from here on, we getting fronted what we cop from here on out. So, so, so the front cause we waited, we waited four days. Right? We waited four days for every play, right? So two days, two days, right. So, he going give us at least a week for whatever we get fronted. I ain't trying to hear no, you, when you get fronted, you don't pay that day. |
| UNIDENTIFIED MALE: | [Inaudible] |

---

[2]The unidentified male was at Mosley's location.

MOSLEY:               Nah, but, but I'm saying so he not I'm saying I understand that. But he was supposed to have a whole other load right now, of his load?

UNIDENTIFIED MALE:    [Inaudible]

MOSLEY:               Right, but I'm, this what I'm saying.

UNIDENTIFIED MALE:    A whole week [Inaudible].

MOSLEY:               Alright, I'm, I feeling that, but this what I'm saying. He's saying because we're going in the same box. Because I'm moving it for him. They not, he can't get them moved for real. I'm mean he's saying he got them.

UNIDENTIFIED MALE:    Right, so he saying.

MOSLEY:               Right, he saying the, that, that, that's why we switched it up. He said bro when, um, when you, when you send it in a box give me two tickets.

UNIDENTIFIED MALE:    Right, so.

MOSLEY:               Right. I'm thinking he's ordering every time up over there. So now that's what I'm saying [Inaudible] a week now, from the same order once a week now. That means it, it, it's there now. It's there now. So now when everybody comes it, it, it should be that. It shouldn't even be no, it shouldn't have to wait. Which it never, it, it should never be, uh, know what I'm saying? You feel what I'm saying?

UNIDENTIFIED MALE:    [Inaudible]

MOSLEY:               Nah, I ain't, my bro on the phone I can't call him [Inaudible]. Hey yeah, hey bro.

| | |
|---|---|
| WELLS: | Yo. |
| MOSLEY: | Yeah, that's what I'm 'bout to, um, you hear me? You heard everything going on? |
| WELLS: | Yeah, I heard. Yeah, I heard everything, I hear, I heard it. I heard it. |
| MOSLEY: | Well I'm about to go in here, but I'm about to go in here right now, and, um, I'm about to tell you the, the exact date. Stay on the [Inaudible]. The exact dates for the, um, for our receipts and shit. You hear me? |
| WELLS: | Yeah, I hear you. |
| MOSLEY: | Hold on just stay on the line. |
| | .            .            . |
| MOSLEY: | Guaranteed Wednesday bro. Facts. |
| WELLS: | Alright, alright, alright, bet. |
| MOSLEY: | Hold on, hold on, hold on bro, and that's on everything bro. Facts, Wednesday. |

*Resp. to Mosley's Mot. for a Franks Hearing (ECF No. 450)*, at 3-6, ECF No. 452 (quoting phone conversation from July 21, 2019).


The United States asserts that Mosley and Langford traveled from Akron, Ohio to Columbus on July 24 to complete the methamphetamine deal. According to the United States, several telephone calls amongst Mosley, Langford, Wells, and Waite were intercepted before and after the deal detailing locations and arrangements. The United States alleges that, before the

Columbus transaction, the following the three-way conversation occurred on July 24 at 11:34 a.m.

between Mosley and Langford, with Wells listening on a different phone:

| MOSLEY: | George, you got a bitch? |
|---|---|
| LANGFORD: | Do I got a bitch? |
| MOSLEY: | Yeah, you got a bitch, you got, with, with a license, a licensed driver? |
| LANGFORD: | Bro, I got a license. But, yeah, I can find a bitch though. |
| MOSLEY: | Yeah, you better roll, yeah, I think you should, what you, I mean, we going to talk, ain't on no clear line, but, uh, yeah, come on bro, come on right now though. Come on. |
| LANGFORD: | I'm getting dressed right now. I'm about to call me a bitch up right now. |
| MOSLEY: | Yeah, get it together, come on bro. Time ready to pick up. And I'm about to go get [Inaudible] too. |
| LANGFORD: | Oh you give me about, give me 45 to a hour man. I'm gonna have a bitch and be ready. |
| MOSLEY: | Alright. An hour what, how long? |
| LANGFORD: | I said 45 minutes to a hour. Not, not longer than an hour. I'm gonna have the bitch picked up, and ready and everything. |
| MOSLEY: | Alright. So I am saying, bro, we jumping on that, bro, we jumping on the express way at 12:30 bro. |

.          .          .

*Id.*, at 6, 7 (quoting "first" phone conversation from July 24, 2019 at 11:34 a.m.).

Later that same day, agents intercepted a call at approximately 3:21 p.m. between Mosley and Langford in which Mosley directed Langford to meet him at a specific location in Columbus to complete the deal. The recorded conversation included the following discussion:

MOSLEY:          Yo.

LANGFORD:      Shit, I'm here.

MOSLEY:          Oh yeah, pull up right here. I'm right here in front of this little food spot.

LANGFORD:      Which one?

MOSLEY:          The one on the side.

LANGFORD:      You said where?

MOSLEY:          The one on the side bro, the food spot right here.

LANGFORD:      You talking about the, um, the corner store?

MOSLEY:          No, come to the other side. Come around, come to other side of the car wash. Come behind the car wash you gonna see it.

LANGFORD:      Alright, I'm gonna come. I'm about to pull in right over there. They got a bathroom man? I got to piss.

MOSLEY:          Yeah, hell yeah. We in a restaurant.

LANGFORD:      What is it called? Debbies?

MOSLEY:          I don't know come right here. I'm right here. You'll see me.

LANGFORD:      Oh, alright.

MOSLEY:          Yeah, you can't miss it.

*Id*. at 7, 8 (quoting "second" phone conversation from July 24, 2019).

-8-

Shortly following the transaction in Columbus, the United States asserts another call was intercepted with Mosley, Langford, and Wells, while Mosley and Langford were traveling to Akron, Ohio. During this conversation, arrangements were made to transfer the drugs to this district the next day:

LANGFORD:  For real bro. I figure we about to pull up, he got them pull up to a barber shop.

WELLS:  He, they all in all red huh?

LANGFORD:  No, the one nigga he met, the nigga he met was in all red. And the nigga he was talking about. They got a red tee on with some blue pairs. I'm like, man. But the other, the nigga, the nigga with the red on, that's his nigga with the other nigga. You don't know him. But you know, he like, "you got the stick," soon as I got out the car. And I'm like, man, damn, it's tweaky like that boy? The fuck.

WELLS:  Damn. This tweaky.

Langford:  Yeah.

WELLS:  They like, they bringing, they buying big bags, this a movie.

LANGFORD:  Man, but the nigga bro, it was like, like I said, the nigga who we meet up ain't even got nothing to do with the bag. He just, where we was at, he's like, yeah, this his hood. Like, so, you know, I'm just, I'm like man.

WELLS:  [Inaudible] in the hood doing [Inaudible].

LANGFORD:  Yeah, damn right man. Man, [Inaudible].

.   .   .

LANGFORD:  Hold on. Talk to bro real quick while I'm driving real quick.

MOSLEY:  Hello.

WELLS:          Yo.

MOSLEY:        What's the deal brother?

WELLS:          What up buddy?

MOSLEY:        Shit, you already know. Yeah, it's gone be alright though. Everything.

.          .          .

MOSLEY:        Shit's gonna be, it's gonna be [Inaudible] though, I'm telling you. Just gotta let this shit play out. Just keep playing your part though. You know what I'm saying that's it, cause you know how you about to play hard. Yeah that shit gonna hurt. How motherfuckers playing they hand. You already know nigga that [Inaudible], you gotta go hard. That shit hurt. You know what's going on. All this shit hurt. Ain't no backing down from it. It is what it is. You already know what it feels like.

.          .          .

MOSLEY:        Yeah, and guess what? They still running. You feel me? It's still running, they snaked you, you still running. You feel me? On everything. Can't kill you, can't take you out of. On everything bro, we moving forward. We on it. It's going. On everything. Yo, you know your mans ain't gonna stop. From the left, to the right.

MOSLEY:        You feel me? Wherever you want them to go. Wherever you want it to go, it's there, secured. Ain't nothing changed. Can't even lose. You filthy.

WELLS:          Yeah, but y'all my real niggas though.

MOSLEY:        You filthy in there. I told you.

WELLS:          That's all it is. Y'all my real niggas [Inaudible].

| | |
|---|---|
| MOSLEY: | Filthy in there. Gotta take it like Chapo. You filthy in there, like you filthy in there. |

.          .          .

| | |
|---|---|
| MOSLEY: | We think though, the team. When you wan them niggas get championships bro, them niggas work for that. That was a fit. It was a fit. They could've say nothing about it. They all playing they fucking part. At the end of the day they won. They got that ring on. We all playing our part. They can't stop it. On everything. You still the point guard. It's still going. Niggas go get it off the backboard. Score. Scoring. Don't nothing, you feel me? You can't what. I tell you. |
| WELLS: | Right. |
| MOSLEY: | As long as you keep that mind state though. As long as you keep that mind state. All them in there. You bigger than all them. That's when a different statement come when you put that in your mind. Like what, you bigger than all that, all them. But [Inaudible] feels, what they talking about? [Inaudible] ain't a price, they can't name, none of it, what, ain't what. Feel me? We hit the lottery. Real shit bro we hit the lottery. On everything so. |
| WELLS: | Handle that. Handle that, man, be safe. |

*Resp. to Mosley's Mot. for a Franks Hearing*, at 6-9, ECF No. 395 (quoting "third" phone conversation from July 24, 2019).

Thereafter, on August 6, 2019, Special Agent Ortega submitted a 122-page affidavit to the Court in support of an Application for the Interception of Wire and Electronic

Communications over four telephones, including the phoneline ultimately attributed to Mosley.[3] In the affidavit, Special Agent Ortega summarized that Langford was involved in the distribution of significant quantities of methamphetamine. Langford was identified by a cooperating witness as a "kilogram level" methamphetamine distributer. *Affid. of SA Ortega*, at ¶¶ 27, ECF No. 452-1. Agents also had evidence that Langford had supplied several others with methamphetamine. *Id.* at ¶¶ 27, 36, 63-72, 84-85, 88-89. To support the wiretap of Mosley's phone, Special Agent Ortega quoted and summarized portions of the conversation on July 21 and the first and second telephone calls from July 24. *Id.* at ¶¶ 102-07. Mosley contends, however, that Special Agent Ortega materially misquoted what he said during the conversation on July 21. Specifically, Special Agent Ortega represented that Mosley stated, "[s]hit, getting this meth together," *id.* at ¶102, but Mosley asserts he actually said "getting this math together." Mosley argues his conversation had nothing to do with methamphetamine and the wiretap would not have been issued for his phone but for Special Agent Ortega's reckless disregard for what actually was said. The Court disagrees.

Initially, the Court mentions that the affidavit and the Application were submitted to the undersigned judge so this Court is well versed with the evidence provided in support of the wiretap applications. In this regard, there was significant evidence that implicates Langford in an extensive methamphetamine conspiracy. Although for the purposes of these motions, the United States accepts that Mosley used the word "math" rather than "meth,"[4] Mosley has made no showing that the purported error was anything more than an innocent mistake. This "mistake" is

---

[3] The affidavit listed "Laniere Herring" as the subscriber of the phone that was later attributed to Mosley.

[4] The United States represented at the hearing that the final determination as to whether Mosley said "meth" or "math" should be left for the jury to decide.

particularly understandable in light of the totality of the circumstances involving a large methamphetamine conspiracy and the earlier recorded conversations with Langford, an alleged high-level methamphetamine dealer. In fact, the Court finds no evidence whatsoever that Special Agent Ortega knowingly and intentionally attempted to deceive the Court or acted in reckless disregard of the truth.

Additionally, assuming Special Agent Ortega did misquote Mosley, the false statement was not necessary to the Court's decision to issue the wiretap. The July 21 phone conversation undoubtedly is evidence of drug distribution. In the conversation, Mosley discusses being "fronted," which is well known to mean that someone is given drugs with the expectation that they will pay later after the drugs are sold. In fact, Mosley even explains in the conversation that when you are "fronted" you do not pay that day and they are going to get a week for whatever is fronted. *Resp. to Mosley's Mot. for a Franks Hearing (ECF No. 450)*, at 4 (quoting phone conversation from July 21, 2019). Additionally, as explained by Special Agent Ortega in his affidavit, he believed the conversation involved getting "9" for "[t]he whole play," meaning "9" pounds of methamphetamine for "22-5" or $22,500. *Affid. of SA Ortega*, at ¶103. There also is a discussion about previous amounts fronted and a package being scheduled for delivery on Wednesday. *Id*. Moreover, the phone conversations on July 24 quoted and discussed by Special Agent Ortega provided additional and significant evidence of Mosley's involvement in the methamphetamine conspiracy supporting the application for the warrant. Thus, given the totality of the circumstances, the Court finds the use of "meth" instead of the word "math" is of no consequence. Even if the affidavit would have said "math," the Court still would have granted the

-13-

wiretap on Mosley's phone. Therefore, the Court finds Mosley has failed to make a substantial preliminary showing and **DENIES** the motion for the *Franks* hearing.

## II.
## Motion to Dismiss
## Fourth Superseding Indictment

In a similar vein, Mosley argues the fourth superseding indictment must be dismissed because agents used the word "meth" rather than "math" when they testified before earlier grand juries. Specifically, Special Agent Ortega testified that Mosley said the word "meth" before the grand juries that returned the original indictment and superseding indictment. [5] Additionally, Special Agent Adam Bennett used the word "meth" when he testified before the grand jury that returned the third superseding indictment. *Grand Jury Test. of SA Adam Bennett*, at 21 (Charleston Grand Jury, June 23, 2020), ECF No. 470-4. However, Mosley concedes that Special Agent Bennett's used the word "math"—and not the word "meth"—when he testified before the grand jury that returned the fourth superseding indictment. [6]

Despite the use of the word "math" before the most recent grand jury, Mosley argues it was unduly prejudiced by the earlier false testimony. However, as indicated by the United States, only the third and fourth superseding indictments were returned by the Charleston 2020

---

[5]*Grand Jury Test. of SA Antonio Ortega*, at 21 (Beckley Grand Jury, Sept. 24, 2019), ECF No. 470-1; *Grand Jury Testimony of Antonio Ortega*, at 24 (Huntington Grand Jury, Nov. 5, 2019), ECF No. 470-2. When he testified before the grand jury that returned the second superseding indictment he told the grand jurors that the investigation showed that Mosley was involved in a conspiracy to distribute methamphetamine. *Grand Jury Test. of SA Antonio Ortega*, at 21 (Beckley Grand Jury, Jan. 15, 2020), ECF No. 470-3.

[6]*Grand Jury Testimony of SA Adam Bennett*, at 19 (Huntington Grand Jury, June 10, 2021), ECF No. 470-5.

grand jury. The other indictments were returned by the Beckley and Huntington grand juries. Thus, the Charleston grand jurors could not have been unduly swayed by any of the testimony presented to the Beckley and Huntington grand juries.[7]  Additionally, the Court finds no merit to Mosley's argument that Special Agent Bennett's use of the word "meth" on June 23, 2020, when the third superseding indictment was returned, warrants dismissal of the fourth superseding indictment.

When a defendant argues an indictment should be dismissed in light of errors before a grand jury, the defendant must show the grand jury "was substantially influenced, or that there is 'grave doubt' that the decision to indict was substantially influenced, by testimony which was inappropriately before it." *United States v. Feurtado*, 191 F.3d 420, 424 (4th Cir. 1999) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). Additionally, there is a presumption of grand jury regularity[8] and "a federal court may not invoke supervisory power" to correct non-constitutional errors absent actual prejudice. *Bank of Nova Scotia*, 487 U.S. at 254. When there is no prejudice to a defendant on the basis of prosecutorial misconduct, the district court has no authority to dismiss the indictment. *Id*. at 263.

Here, Mosley filed his first motion after the third superseding indictment was returned. *See Mot. for Franks Hearing*, ECF No. 392. Following review of the motion, the United States called Special Agent Bennett to testify again before the Charleston grand jury on June 10,

---

[7]Mosley originally argued the "false" evidence was presented to the same grand jury, but he later conceded that only the third superseding indictment was returned by the Charleston 2020 grand jury.

[8]*See United States v. Mechanik*, 475 U.S. 66, 75 (1986) (O'Connor J., concurring in judgment) ("The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process").

2021. At that time, Special Agent Bennett testified that Mosley used the word "math." However, Special Agent Bennett also testified that the intercepted phone conversations included discussions Mosley had with Langford and Wells arranging for the acquisition of nine pounds of methamphetamine in Columbus for a price of $22,000 or $22,500. *Grand Jury Test. of SA Adam Bennett*, at 18-22 (Charleston Grand Jury, June 10, 2021), ECF No. 468-6. Based upon the totality of the evidence presented to the grand jury against Mosley, the Court **FINDS** it is completely implausible that the testimony presented nearly a year earlier when Mosley used the word "meth" rather than the word "math" in anyway influenced the return of the fourth superseding indictment—particularly as, on the day the current indictment was returned, the grand jury was told the word was "math." Despite what Mosley claims was false testimony, it is clear that there was sufficient evidence of probable cause to support the return of the fourth superseding indictment based upon testimony presented to the grand jury on June 10, 2021. Therefore, the Court **DENIES** the motion to dismiss the fourth superseding indictment.

### III.
### Speedy Trial

Mosley also filed a motion to dismiss pursuant to Federal Rule of Criminal Procedure 12(b)(3)(A)(iii)[9] and 18 U.S.C. § 3162(a)(2) for speedy trial violations.[10] In relevant part, the Speedy Trial Act provides:

> [i]n any case in which a plea of not guilty is entered,
> the trial of a defendant charged in an . . . indictment
> with the commission of an offense shall commence

---

[9] Rule 12(b)(3)(A)(iii) provides "a violation of the constitutional right to a speedy trial" "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits[.]" Fed.R.Crim.P 12(b)(3)(A)(iii).

[10] Section 3162(a)(2) states, in part: "If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant." 18 U.S.C. § 3162(a)(2).

> within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1), in part. The Speedy Trial Act provides a variety of different exclusions from the seventy-day time period. As relevant here, courts may exclude from the speedy trial computation "[a] reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." 18 U.S.C. § 3161(h)(6). Likewise, excludable time includes a "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). In addition, a court may exclude

> [a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A), in part.

If a court finds a continuance is warranted under the "ends of justice," the court must "set[ ] forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." *Id*. In making such a decision, the court may consider "among other" things, "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." 18 U.S.C. § 3161(h)(7)(B)(i). The court also should consider "whether the case is complex

-17-

or unusual, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." 18 U.S.C. § 3161(h)(7)(B)(ii). If the case, as a whole, is not so complex or unusual, the Court may consider whether not continuing "would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence." 18 U.S.C. § 3161(h)(7)(B)(iv). However, the Act prohibits a court from considering two factors: "general congestion of the court's calendar" and the Government's "lack of diligent preparation or failure to obtain available witnesses." 18 U.S.C. § 3161(h)(7)(C). Before a court rules on a motion to dismiss for an alleged violation of the Speedy Trial Act, the court must put its findings for any continuance on the record. *Zedner v. United States*, 547 U.S. 489, 507 (2006) ("[T]he Act implies that those findings must be put on the record by the time a district court rules on a defendant's motion to dismiss under § 3162(a)(2).").

As previously stated, Mosley was first indicted by the grand jury on September 24, 2019, and a superseding indictment was returned against him on November 5, 2019. On November 18, 2019, he was arrested in the Northern District of Ohio and was ordered committed to this district. Thereafter, Mosley was transferred and arraigned in this district on December 10, 2019.

At that time, trial was scheduled to begin on February 4, 2020. The time between Mosley's first appearance in this district and the February 4 trial date was 56 days.

On January 15, 2020, the second superseding indictment was returned. Mosley was arraigned on that indictment on January 23, 2020, and the trial was reset for March 17, 2020. As there were significant changes between the superseding indictment and the second superseding indictment, the Court was required to set a new trial date pursuant to 18 U.S.C. § 3161(c)(1). *See United States v. Dixon*, 542 F. App'x 273, 278 (4th Cir. 2013) (per curiam) ("The filing of the superseding indictment in this case restarted the STA trial clock."); *United States v. Lesczynski*, 86 F. App'x 551, at *3 (4th Cir. 2004) (per curiam) (finding "the literal requirements of the Speedy Trial Act were met because a superseding indictment that adds either a new defendant or new charges restarts the speedy trial clock"); *United States v. Muhammad*, No. CRIM. 2:08-1237-PMD, 2011 WL 1576556, at *7 (D.S.C. Apr. 26, 2011) (holding the "superseding indictments restarted the speedy trial clock"), aff'd in part and remanded, 498 F. App'x 251 (4th Cir. 2012).

Thereafter, McDaniels was arrested, made his initial appearance, and was arraigned in this district on February 24, 2020. To provide him adequate time to prepare for trial, a new trial date was set for April 28, 2020.[11] That same day, the Court also continued the trial date for Mosley, Langford, Waite, and Hicks to April 28, and found the time between March 17 and April 28

---

[11]The Court observes that the March 17 trial date did not provide McDaniels with at least thirty days before trial pursuant to 18 U.S.C. § 3161(c)(2). In relevant part, this section provides that "[u]nless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel[.]" 18 U.S.C. § 3161(c)(2).

excludable from the computation of time within which trial must commence pursuant to 18 U.S.C. § 3161(h)(6).

In the meantime, on March 13, 2020, the Honorable Thomas E. Johnston, Chief Judge of this district, entered the first in a series of General Orders continuing all trials until further order of the Court because of the COVID-19 pandemic. *Gen. Order #1*, 2:20-mc-00052 (S.D. W. Va. Mar. 13, 2020), ECF No. 1. In continuing all criminal trials, General Order #1 found the time period excludable pursuant to § 3161(h)(7)(A) because the ends of justice served outweighed both the public and defendants' rights to speedy trials. In doing so, the Court recognized the public health concerns caused by the pandemic, specifically mentioning that West Virginia's population is relatively elderly and has a "high incidence of other medical conditions that can make individuals more vulnerable to the virus." *Id*. at 2. The Court also found the pandemic reduced the Court's "ability to obtain an adequate spectrum of jurors" and impacted "the availability of counsel and Court staff to be present in the courtroom[.]" *Id*. General Order #3 was entered on March 23, 2020, extending the continuance until April 24, 2020, again finding the time excludable pursuant to § 3161(h)(7)(A) due to the exigent circumstances created by the pandemic.[12] *Gen. Order #3*, 2:20-mc-00052 (S.D. W. Va. Mar. 23, 2020), ECF No. 3. Two days later, on March 25, this Court cited the General Orders and found the pandemic necessitated the continuance of the trial in this case until June 2, 2020, finding the time between April 28 and June 2 excludable under § 3161(h)(7)(A).

---

[12]General Order #2 involved pandemic protocols to be followed.

Although this specific case already was continued to June 2, General Order #5 was entered on April 14, 2020, and continued all trials in this district until May 31, 2020, excluding the time between April 24 and May 31 again under § 3161(h)(7)(A). *Gen. Order #5*, 2:20-mc-00052 (S.D. W. Va. Apr. 14, 2020), ECF No. 6. Following the entry of General Order #5, this Court entered an Order on May 5 continuing the June 2 trial date for this case until the trials are permitted to resume in the district, finding the time excludable between June 2 and the future trial date under § 3161(h)(7)(A). Thereafter, General Order #6 was entered on May 22, 2020, adopting its previous findings and continuing the criminal jury trials until June 30 and finding the time excludable pursuant to § 3161(h)(7)(A). *Gen. Order #6*, 2:20-mc-00052 (S.D. W. Va. May 22, 2020), ECF No. 7. In the meantime, Langford filed a motion to suppress, and this Court entered an Order on May 28 setting a briefing schedule and resetting the trial to begin on July 14, 2020.[13]

On June 23, the United States moved to continue the July 14 trial date.[14] As grounds for the motion, the United States noted that Langford and Mosley had limited access to their counsel while incarcerated due to pandemic restrictions and, as a result, they were unable to review the voluminous evidence in the case, including a large number of the intercepted recordings that had been disclosed. As a result, the United States expressed serious constitutional concerns about potential ineffective assistance of counsel claims. The United States also expressed concerns about trial logistics in light of the pandemic, the number of Defendants, the large number of potential jurors needed, the large number of the witnesses it intended to call, and the length of the

---

[13] The Court denied Langford's motion on June 16, 2020.

[14] The third superseding indictment also was returned on this day, but it was not a factor cited by the United States in requesting the continuance.

trial. The United States represented that the parties were discussing stipulations in the hopes of streamlining the trial, but none had been entered into by the time the motion was filed. Additionally, counsel for Mosley and Waite informed the United States that they did not object to a continuance for the stated reasons. However, Langford's counsel was not authorized to consent, and his counsel filed a Response in opposition to the continuance. *Resp. of Def. Langford to Mot. of U.S. to Cont. Trial*, ECF No. 262.

After reviewing the motion, the Court agreed with the United States and, by Order entered on June 24, found counsel must be afforded sufficient time to meet with their clients to prepare for trial. Additionally, the Court found insufficient time existed to make the necessary preparations for a lengthy, three-defendant trial, particularly as all trials were postponed due to the pandemic for April, May, and June, and it was uncertain whether July trials would be held. Therefore, the Court granted the motion, denied Langford's request for a severance, and reset the trial to begin on September 29, 2020. The Court found the time between July 14 and September 29 was excludable pursuant to § 3161(h)(7)(A).

On June 25, Langford moved to be appointed new counsel due to irreconcilable differences. After holding a hearing, the Court granted the motion and appointed new counsel on June 20, 2020. On August 27, Langford's new counsel filed a motion to continue the trial for at least forty-five days to give him additional time to review discovery, communicate with the United States, and consult with his client. In the motion, counsel also noted it was difficult to consult with his client because of the pandemic rules at the detention center where his client was being held. Although the United States and Waite did not oppose the motion, Mosley filed a response in

opposition. Despite Mosley's opposition, the Court found the continuance necessary to give Langford's new counsel adequate time to prepare for a complex case involving multiple defendants. Therefore, the Court continued the trial until November 3, 2020, and found the delay between September 29 and November 3 excludable pursuant to § 3161(h)(7)(A) and (B).[15]

In the meantime, co-defendant Glover was arrested in Florida and was arraigned in this district on September 29, 2020. Counsel for Glover then moved to continue to give him adequate time to prepare. On October 6, 2020, the Court granted the motion and reset the trial for Mosley, Langford, Waite, and Glover for January 12, 2021, finding the time between November 3 and January 12 excludable under § 3161(h)(6) and (7)(A).

On December 4, 2020, counsel for Langford moved to continue the trial for at least sixty days, noting that there was significant community spread of COVID-19 and it seemed unlikely that trials in the district would resume before January 12. Counsel also represented that neither the United States, nor the other Defendants, objected to the motion. By Order entered on December 7, the Court agreed, resetting the trial to begin on April 6, 2021, finding the time between January 12 and April 6 excludable pursuant to § 3161(h)(6) and (7)(A).[16]

---

[15]For clarity, the Court finds the continuance from September 29 to November 3 also was excludable under § 3161(h)(6) as Mosley was joined for trial with Langford.

[16]The Court notes that all jury trials were continued district wide during this time period due to the pandemic. *See Gen. Order #9*, continuing all civil and criminal petit jury trials effective September 21, 2020; 2:20-mc-00052, ECF No. 12.

Over the next few months, Mosley made several case-related actions that resulted in multiple continuances. On December 11, Mosley made a motion for appointment of new counsel due to irreconcilable differences. At a hearing held on December 21, the Court granted the motion and directed new counsel be appointed. Thereafter, on February 4, 2021, Mosley's new counsel moved to continue for ninety days because he had just received voluminous discovery in mid-January and he wanted to receive his COVID-19 vaccination before visiting his client in jail. As there was no objection by the United States or his co-defendants, the Court granted the motion and reset the trial for July 13, 2021, finding the time between April 6 and July 13 excludable under §3161(h)(6) and (7)(A). Approximately six weeks before the July 13 trial date, Mosley again sought to get new counsel appointed to represent him. On June 1, 2021, the Court held a hearing and directed new counsel be appointed. Within days of his appointment, Mosley's new counsel moved to continue to review discovery and prepare for trial. The Court granted the motion on June 8, and reset the trial for November 9, finding the time excludable between July 13 and November 9 under § 3161(h)(6) and (7)(A). On June 10, 2021, the fourth superseding indictment was returned, but the trial date remained November 9. Mosley now moves to dismiss this indictment for violations of the Speedy Trial Act.

In his motion, Mosley argues that his speedy trial clock began to run with his initial appearance in this district on December 10, 2019, and he asserts it expired on February 19, 2020, before any of the pandemic General Orders were entered. *Mot. to Dismiss Fourth Superseding Indictment for Speedy Trial Violation*, at 4, ECF No. 472. As the trial did not begin by February 19, Mosley asserts the case against him must be dismissed pursuant to § 3161(a)(2).

-24-

However, as stated above, a second superseding indictment was returned on January 15, 2020. Mosley was arraigned on the indictment on January 23, 2020, and the Arraignment Order reset the trial date to March 17, 2020. Although there was not a separate order entered expressly finding the time excludable between the original trial date of February 4 and March 17, the United States requests such a finding be made to make the record clear.

In comparing the superseding indictment with the second superseding indictment, the Court finds an order excluding the time between February 4 and March 17 was unnecessary as there were significant differences between the two indictments, which restarted the speedy trial clock. For instance, the second superseding indictment increased the time period of the alleged conspiracy, was returned after a new witness testified before the grand jury, added evidence regarding the purity of the methamphetamine that resulted in charging much lower thresholds, and charged Langford with an additional offense carrying a statutory penalty of ten years to life. Nevertheless, to the extent an Order was needed, the Court **FINDS** the differences between the indictments, coupled with the complexity of the case and the number of defendants, made it "unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section." § 3161(7)(B)(ii). Therefore, the time period between February 4 and March 17 would have been excludable to serve the "ends of justice" and "granting of such continuance outweigh[ed] the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Accordingly, the Court rejects Mosley's argument the speedy trial clock expired on February 19, 2020.[17]

---

[17]In the Court's May 5, 2020 Order, the Court continued the June 2, 2020 trial generally due to the pandemic and found the time excludable pursuant to § 3161(h)(7)(A). The Court reset the trial date to July 14, 2020 by an Order entered on May 28, 2020. To the extent additional

The Court also rejects Mosley's arguments that the continuances based upon the pandemic violated his right to a speedy trial. In support of his argument, Mosley cites *United States v. Henning*, 513 F. Supp.3d 1193 (C.D. Calif. 2021), in which the district court dismissed an indictment after finding that conducting a single-defendant trial during the pandemic was not impossible. 513 F. Supp.3d at 1205, 1209-10. However, the Court is not persuaded that *Henning* should apply here. Unlike *Henning*, this case was complex involving a large number of counts, multiple defendants, multiple witnesses, and voluminous evidence, which undoubtedly would result in a lengthy trial. Additionally, the sheer number of defendants, counsel, witnesses, jurors, court security officers, court staff, and others in attendance would have made social distancing to mitigate COVID-19 transmission an impossibility. Moreover, although the Fourth Circuit has yet to directly address the issue of district-wide continuances by General Orders, many other district courts have reached the opposite conclusion of *Henning* and found continuances served the ends of justice and granting such continuances outweighed the best interests of the public and defendants in a speedy trial. *See United States v. Pair*, 515 F. Supp. 3d 400, 409 (E.D. Va. 2021) (collecting cases). Here, the General Orders specifically recognized that the demographics of West Virginia made its residents particularly vulnerable to COVID-19, as the population tends to be older and has a higher incidence of certain underlying medical conditions that may cause more severe illness from the virus. *See Gen. Order #1*, 2:20-mc-00052, at 2. The General Orders also found the pandemic reduced the Court's "ability to obtain an adequate spectrum of jurors" and impacted counsel and court staff's availability in the courtroom. Given these factors, the Court

---

findings were needed, the Court finds the continuance was necessary pursuant to § 3161(h)(D) to allow briefing, hearing, and a prompt disposition of Defendant Langford's motion to suppress.[17] The continuance also served the ends of justice and outweighed the public and Defendants' interest in a speedy trial pursuant to § 3161(h)(7)(A) and § 3161(7)(B)(ii), by providing the parties sufficient time to meet with their clients and prepare for trial.

finds the General Orders were appropriate and the continuances issued by the General Orders were properly excluded from the speedy trial calculation.[18]

Finally, the Court finds that, to the extent Mosley argues his seventy-day clock should have begun when he had his initial appearance in the Northern District of Ohio, his argument is without merit. The statute clearly provides that the speedy trial clock began when Mosley made his appearance "before a judicial officer of the court in which such charge is pending." 18 U.S.C. § 3161(c)(1), in part. As Mosley appeared in this district on December 10, 2019, it is that date that started the clock.

Therefore, as all the days after February 4, 2020 were properly excluded from the calculation of the speedy trial clock and there were a total of 56 non-excludable days between December 10, 2019, and February 4, 2020, the Court **FINDS** Mosley's speedy trial rights were not violated and **DENIES** his motion to dismiss.

Similarly, as Langford joined in this motion, the Court **FINDS** his speedy trial rights were not violated. Langford was arraigned on the original indictment on October 21, 2019, and a trial date of December 3, 2019 was set. On October 31, 2019, Langford made a Motion to Continue for a period of not less than sixty days. *Mot. of Def. Langford for Cont. of All Time Framed Dates*, ECF No. 89. By Order entered on November 1, the Court granted the motion resetting the trial date to February 4, 2020, finding the time between December 3 through February

---

[18]Moreover, the Court finds that the General Orders operated mostly in the background in this case because there were a number of case-specific continuances entered in this matter.

4 excludable pursuant to § 3161(h)(6) and (7)(A). As the above post-February 4 discussion with respect to Mosley applies equally to Langford, Langford's speedy trial clock also had not run. Accordingly, the Court **DENIES** his motion.

## IV.
### Conclusion

Accordingly, for the foregoing reasons, the Court **DENIES** the Motions for a Franks Hearing (ECF Nos. 392, 450) and the Motion to Dismiss Fourth Superseding Indictment for a Speedy Trial Violation. ECF No. 472. In addition, the Court **DENIES AS MOOT** Defendant Mosley's Motion for Release on Bail Due to 18 U.S.C. § 3164(b) Violation. ECF No. 474.

The Court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:          November 9, 2021

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-28-